UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 5:15-CV-27-REW |
| v. | ) | |
| | ) | MEMORANDUM OPINION AND |
| $38,005.00 IN UNITED STATES | ) | ORDER |
| CURRENCY, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

The United States and Claimant, Julius L. Belle, filed cross-motions for summary judgment. DE ##18 (Claimant's Motion), 19 (United States's Motion). Plaintiff responded, DE #20 (Plaintiff's Response), but Claimant did not. Nor did Claimant reply. The motions are ripe for consideration. For the following reasons, the Court **DENIES** both motions. Claimant fails to justify suppression under the Fourth Amendment. Further, genuine factual disputes preclude summary judgment for either side.

I.      **Relevant Factual and Procedural Background**

On February 5, 2015, the United States filed a verified complaint *in rem* to obtain forfeiture of $38,005.00 pursuant to 21 U.S.C. § 881(a)(6). DE #1 (Complaint). The complaint, supported by an affidavit from DEA TFO Robert J. Hart, alleges that the currency "was furnished or intended to be furnished in exchange for controlled substances, was proceeds traceable to such an exchange, or was intended to be used to facilitate the illegal sale of narcotics." *Id.* at 2 ¶ 6. Belle, by counsel, answered the Complaint on March 16, 2015, tendering also a verified claim. DE #4 (Verified Claim);

1

DE #5 (Answer). Following a discovery period, the Government and Claimant filed the motions currently under consideration.

This forfeiture action arises from a traffic stop of Julius Belle by Lexington Police on May 22, 2014.[1] In the afternoon of the 22nd, Lexington Police Officers Ryan Nichols and Matthew Merker were in one unit patrolling a Lexington PD-designated "high criminal activity" area. DE #18-2 (Nichols Deposition), at 6-7. Shortly before 5 p.m., the

---

[1] After the time for briefing the cross-motions for summary judgment had elapsed, Claimant filed a motion to strike hearsay statements. DE #21 (Motion). Citing *United States v. $64,495.00 in U.S. Currency*, No. 5:13-CV-265-REW, 2014 WL 5432119 (E.D. Ky. October 27, 2014), Claimant requests that the Court strike all statements contained in the affidavits and deposition testimony submitted by the United States that are hearsay or not based on the personal knowledge of the affiant or deponent. *Id.* The Court notes two primary difficulties in addressing the motion to strike (DE #21). First, Claimant does not identify specifically *any statements* he is particularly challenging as inadmissible. Second, Claimant filed the motion well after his time for responding to the United States's motion for summary judgment had passed. The motion to strike is something of a second bite at the apple qua challenging Plaintiff's motion.

The Court also notes differences between *$64,495.00* and this case. In *$64,495.00*, the United States relied almost entirely on the affidavit of a Versailles police detective to support its motion for summary judgment. 2014 WL 5432119, at *4-6. Most of the affidavit centered on second hand reports from investigators in other jurisdictions and only a small portion reflected the detective's personal knowledge. In this case, the United States provides deposition transcripts and affidavits from Lexington police officers actually involved in the traffic stop of Belle and subsequent seizure of the $38,005.00 in cash. *See* DE #19-2 (Nichols Deposition); DE #19-4 (Hart Affidavit, as to Belle interviews); DE #19-5 (Karsner Affidavit). These documents, and the corresponding statements, largely reflect first-hand knowledge and satisfy Rule 56 requirements.

The Court does note that Rule 56 requires reliance on admissible evidence in the summary judgment context. Specifically, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Further, an affidavit used in support of a motion "must be made on personal knowledge [and] set out facts that would be admissible in evidence[.]" Fed. R. Civ. P. 56(c)(4). However, a court may consider "evidence submitted at summary judgment in non-admissible form when the evidence will be reduced to admissible form at trial." *DeBiasi v. Charter County of Wayne*, 537 F. Supp. 2d 903, 911-12 (E.D. Mich. 2008) (quotations and citations omitted). Based on the lack of detail in the motion, the Court **DENIES** DE #21. However, in considering the cross-motions, the Court has not relied on evidence that could not "be presented in an admissible form at trial" or otherwise does not comport with Rule 56(c)(4). *Id.*

officers observed a "white Challenger with dark tinted windows" operating near a gas station on the corner of Augusta and Etawah Drives. *Id.* at 9; DE #18-1 (Plaintiff's Discovery Responses – Uniform Citation), at 42. Based on the observation that the windows were illegally tinted, the officers initiated a traffic stop for excessive window tint, at 4:55 p.m. *Id.*

After the officers activated their flashing lights, Belle pulled into a gas station. *Id.* at 15. Belle did not immediately stop upon entering the station parking area; he proceeded to a gas pump and exited his vehicle as if to pump gas. *Id.* Officer Nichols asked Belle to return to his vehicle, radioed (via Merker) in the stop, and approached Belle. *Id.* at 15-16; DE #18-1 (Dispatch Log), at 16. Officer Nichols requested Belle's information, including his driver's license, registration, and proof of insurance. *Id.* at 18. Belle provided a permit of some type but was unable to provide a valid driver's license or proof of insurance. *Id.* According to Officer Nichols, Belle appeared nervous as evidenced by his labored breathing and visibly excessive heartbeat. *Id.* at 19. After the initial questioning, Officer Nichols returned to his patrol vehicle and began to run Belle's personal information. *Id.* This check involved radioing Belle's information into dispatch[2] and accessing the Fayette County jail website. *Id.* According to Officer Nichols, the database revealed numerous arrests for drug trafficking and carrying a concealed deadly weapon. *Id.* at 19, 54. Based on Belle's nervousness, the time he took to stop his vehicle,

---

[2] The records check revealed that the vehicle driven by Belle was not registered in his name and that Belle had no active warrants. DE #18-2, at 51. During his deposition testimony, Officer Nichols could not remember precisely when he had received this information. *Id.* at 23 ("Q: Did you find [the information] out before the canine got there? A: I don't recall.").

3

the high crime nature of the area of stop, and Belle's prior arrest record,[3] Officer Nichols

radioed for the assistance of a narcotics canine at approximately 5:01 p.m. *Id.* at 19, 48-

50; DE #18-1 (Dispatch Log), at 16.

Two canine units arrived at the scene at approximately 5:12 p.m., including

Lexington Police Officer Chad Karsner and his certified drug dog, Lux. *Id.* at 25; DE

#18-1 (Dispatch Log), at 16. While Officer Merker remained with Belle, Officer Nichols

briefly described the situation to Officer Karsner. *Id.* at 26. Officer Nichols then

presented Lux to the vehicle. *Id.* Lux alerted to the driver's side front quarter panel and

the driver's side rolled down window. DE #19-5 (Karsner Affidavit), at 3. While Officer

Karsner presented Lux, Officer Nichols engaged in casual conversation with Belle. DE

#18-2, at 28. According to Officer Nichols, "one minute or less" elapsed between the

canine's initial presentation to the vehicle and the alert. *Id.* at 29.

Based upon Lux's alert, the officers decided to search the vehicle. Prior to the

search, Officer Karsner asked Belle "if there was anything inside the vehicle [the

officers] needed to know about." *Id.* Belle advised that there was "a lot of cash in the

trunk . . . around $40,000."[4] *Id.* Upon searching the vehicle, Officer Karsner observed

"marijuana shake"[5] on the floor board between the driver's seat and center console, as

---

[3] Officer Nichols provided somewhat conflicting statements regarding the role Belle's arrest record played in his decision to radio for a drug dog. *Compare* DE #18-2, at 19 ("Once we had that [arrest] information, based upon his involuntary body language, the time it took him to stop his vehicle . . . I requested a narcotics canine."), *with id.* at 49 ("Q: Would you have called the canine unit if it had come back that Mr. Belle had no criminal record whatsoever? A: Yes, ma'am. Q: You would have called anyway? A: Due to his involuntary body actions, yes, ma'am.").

[4] Belle claims that he intended to use the cash in the trunk to make a cash offer on real estate. *See* DE #4 (Verified Claim) ¶ 5; DE #18-3 (Belle Dep.), at 9-11.

[5] "Marijuana shake" is a "slang term for a minute amount of marijuana that falls to the ground during consumption by smoking." DE #19-5, at 3.

well as on the rear floor board behind the driver's seat.[6] DE #19-5, at 3. Officer Karsner further located a large quantity of cash contained within a shopping bag in the trunk. *Id.* According to Officer Karsner, Lux separately alerted to the cash when presented with the bag.[7] *Id.*

After locating the cash and "marijuana shake," Nichols called several additional officers to the scene, including his supervisor, Sergeant Brian Jared, and narcotics unit Sergeant Dawson. DE #18-2, at 34. Sergeant Dawson interviewed Belle. *Id.* at 36. Once Sergeant Dawson completed his interview, Officer Nichols wrote Belle a citation for three traffic violations: (1) window tint below the AS1 line; (2) driving on an expired operator's license; and (3) no insurance. DE #18-1 (Uniform Citation), at 42. Upon issuance, Belle was free to leave.[8] *Id.* The stop ended at approximately 5:56 p.m.[9] DE #18-2, at 37; DE #18-1 (Dispatch Report), at 17. The officers seized the cash.

The primary officers then left the scene of the stop and went to the Lexington PD narcotics office to conduct a count of the seized cash. DE #18-2, at 40-41. Officers counted $38,005.00 in U.S. currency with the following bill breakdown: 116 $100 bills, 74 $50 bills, 1,065 $20 bills, 101 $10 bills, and 79 $5 bills. *Id.*; DE #18-1 (LDP Evidence Record), at 41. The cash as seized was contained within a blue cloth bag within a large

---

[6] Law enforcement did not take any samples or run any tests on the observed "marijuana shake." DE #18-2, at 31. Officer Nichols states that the shake was ground into the carpet and the officers were unable to remove a sample. *Id.*

[7] Lux also alerted to the cash on a later occasion in the Lexington PD narcotics office. DE #19-5, at 3-4.

[8] The record does not show how police handled the car. Presumably, Belle did not drive off alone with no license or insurance.

[9] There is some dispute in the record regarding the actual full duration of the stop. Plaintiff's responses to interrogatories indicate that the conclusion of the stop was 8:36 p.m. *See* DE #18-1, at 8. Based on the log, Nichols testified the stop concluded at 5:56 p.m. DE #18-2, at 37. Only the first part of the stop is of consequence here.

Abercrombie shopping bag and bundled with rubber bands in increments of $5,000. *Id.* at 44-46; DE #18-1 (LDP Evidence Record), at 41; DE #18-1 (Plaintiff's Response to Interrogatories), at 8.

Authorities eventually dismissed the traffic charges upon notice of correction by Belle. DE #18-1 (Plaintiff's Response to Requests for Admission), at 4. Police did not charge Belle with any crimes related to the seized funds. *Id.* In July 2014, Belle filed a petition for remission with the DEA, seeking return of the seized currency. DE #19-4 (Hart Affidavit), at 3. In August 2014, the DEA conducted interviews of Belle and his long-time girlfriend Lavasha Renee[10] Duff.[11] *Id.* Following these interviews, the DEA recommended denial of the petition for remission. DE #18-1 (DEA Report of Investigation), at 33. This civil forfeiture action, targeting the cash seized, followed.

## II.    Standard of Review

A federal civil in rem forfeiture action draws from several procedural sources. The claim origin is statutory (in this case, 21 U.S.C. § 881(a)(6) and CAFRA, 18 U.S.C. § 983).  The particular framework of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions governs specific pleading and claim mechanics. However, the civil rules generally continue to apply except where inconsistent with the Supplemental Rules. *See United States v. $50,800.00 in U.S. Currency*, No. CV-10-2004-PHX, 2011 WL 2434225, at *1 (D. Ariz. June 16, 2011) ("Federal civil in *rem* forfeitures are governed by the Federal Rules of Civil Procedure."); *see also* Supplemental Rule G(1) (assuring that "Federal Rules of Civil Procedure also apply" to forfeiture actions in

---

[10] The Court refers to Ms. Duff as "Renee" throughout, as is her stated preference. *See* DE #19-7, at 4.

[11] Duff did not file a petition for remission with DEA, DE #19-4, at 3, and she is not a claimant with respect to this suit.

6

rem except to extent the Supplemental Rules "address an issue"); *United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d 141, 159-50 (3d Cir. 2003) ("The Civil Rules therefore also apply to in rem proceedings, but only to the extent that they are not 'inconsistent with' the Supplemental Rules[.]"). Thus, the summary judgment mechanics of Rule 56 apply to (and in conformity with) the specific substantive steps of a CAFRA action. *See, e.g., United States v. 939 Salem St., Lynnfield, Mass.*, 917 F. Supp. 2d 151, 154-55 (D. Mass. 2013) ("Summary judgment may be entered in an *in rem* civil forfeiture action where the moving party satisfies the familiar Rule 56 standard.").

Pursuant to Federal Rule of Civil Procedure 56, a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 at 414 ("The party moving for summary

judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). The Rule "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.* at 106 S. Ct. at 2552. If the movant bears the burden of persuasion at trial, "that party must support its motion with credible evidence—using any of the materials specified in Rule 56(c)—that would entitle it to a directed verdict if not controverted at trial." *Id.* at 2556 (citation omitted) (Brennan, J., dissenting); *see also Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002) (noting that, when the movant also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is "higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it") (citation and internal quotation marks omitted).

A fact is "material" if the underlying substantive law identifies that fact, or the element it concerns, as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a

whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp. v. FDIC*, 187 Fed. App'x 428, 444-45 (6th Cir. 2006). That is, the Court only considers information if a litigant could properly present it in a form that would be admissible at trial.

Under the Civil Asset Forfeiture Reform Act of 2000 (CAFRA), 18 U.S.C. § 983, the United States must establish by a preponderance of the evidence "that the property is subject to forfeiture." *Id.* § 983 (c)(1). In making its case, the Government can rely on evidence uncovered after filing the complaint. *Id.* § 983(c)(2). For any property the Government contends "was used to commit or facilitate the commission of a criminal offense" or "was involved in the commission of a criminal offense," it must additionally establish a "substantial connection between the property and the offense." *Id.* § 983(c)(3).[12] The Government can prove a substantial connection by either direct or circumstantial evidence. *United States v. $291,828.00 in U.S. Currency*, 536 F.3d 1234, 1237 (11th Cir. 2008). The United States "need not prove that there is a substantial connection between the property and any specific drug transaction. Instead, the Government may prove more generally, based on a totality of the circumstances, that the property is substantially connected to narcotics trafficking." *United States v. $22,173.00 in U.S. Currency*, 716 F. Supp. 2d 245, 250 (S.D.N.Y. 2010) (citation and internal

---

[12] Per the CAFRA language, the added requirement does not apply to the extent the Government pursues a proceeds theory, which is the theory here. *See United States v. $118,170.00 in U.S. Currency*, 69 Fed. App'x 714, 717 n.1 (6th Cir. 2003) ("[T]he Government need not prove a substantial connection to a specific drug transaction when it advances a drug proceeds theory.").

quotation marks omitted); *see also United States v. $118,170.00 in United States Currency*, 69 Fed. App'x 714, 717 n.1 (6th Cir. 2003) (unpublished).

Additionally, given their quasi-criminal nature, the Fourth Amendment exclusionary rule applies to civil forfeiture proceedings. *One 1958 Plymouth Sedan v. Pennsylvania*, 85 S. Ct. 1246, 1251 (1965); *United States v. $53,082.00 in U.S. Currency*, 985 F.2d 245, 250 (6th Cir. 1993) (citing *Plymouth Sedan* and stating: "Therefore, only legally-obtained evidence may be used to establish probable cause. In this case, the dog's reaction cannot be used to show probable cause because it is the fruit of an illegal seizure, and as such, must be excluded."). Supplemental Rule G(8)(a) expressly authorizes a proper suppression motion in the *in rem* forfeiture context.

The Court must assess, then, whether the United States has met its initial burden under CAFRA and Rule 56, by demonstrating that there are no genuine disputes of material fact as to the basic forfeitability of the res.  *See 939 Salem St.*, 917 F. Supp.2d at 155 (describing "procedural pavane" of CAFRA summary judgment and phrasing initial burden as showing "that the property at stake is subject to civil forfeiture"). The cross motions hinge both on forfeitability and on the propriety of the precipitating seizure.

**III.     Analysis**

In its motion, the Government argues that the totality of the circumstances unquestionably proves by a preponderance of the evidence that the $38,005.00 at issue is forfeitable as proceeds of drug trafficking. DE #19-1 (Memorandum in Support). Specifically, the United States contends that the positive narcotics canine alert to the cash, the contradictory explanations provided by Julius Belle and Renee Duff as to the cash's origin, the cash's denomination distribution and method of bundling, and Belle's

lack of documented legitimate income suffice to validate forfeiture. In his cross-motion, Claimant Belle criticizes the basis for the seizure, namely, an unreasonably extended traffic stop. DE # 18 (Claimant's Motion for Summary Judgment). Belle also contests the forfeitability itself, on the merits. The Court first turns to the Fourth Amendment issue.

1. *The timely dog sniff did not unreasonably extend Belle's traffic stop. Once the dog alerted to Belle's vehicle, probable cause existed to extend the stop and conduct the corresponding search.*

In his motion for summary judgment, Belle primarily argues that authorities unlawfully extended the traffic stop beyond the time required for issuance of the charged traffic violations; therefore, the alert by the narcotics canine and subsequent search of the vehicle violated the Fourth Amendment and yielded property, the *res*, that must be excluded from consideration, resulting in dismissal of the Government's forfeiture claim. DE #18, at 5-9. This argument rests primarily on the contention that officers did not timely conduct the dog sniff relative to the traffic citation's preparation and issuance.

While a dog sniff conducted during a lawful traffic stop does not, of itself, violate the Fourth Amendment, *Illinois v. Caballes*, 125 S. Ct. 834, 838 (2005), "a police stop exceeding the time needed to handle the matter for which the [traffic] stop was made [does violate] the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015). Accordingly, "[a] seizure justified only by a police-observed traffic violation . . . 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* (quoting *Caballes*, 125 S. Ct. at 837). Ultimately, "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—

11

completed." *Id.* at 1614. "[A] traffic stop prolonged beyond that point is unlawful" absent particularized reasonable suspicion justifying further detention. *Id.* at 1616.

The permissible scope of a traffic stop includes "ordinary inquiries incident to" the traffic stop, which can involve "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615 (quotation and citations omitted). Courts must gauge the reasonableness of the seizure by "what the police in fact do." *Id.* at 1616. "The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff prolongs—i.e., adds time to—the stop." *Id.* (quotations and citations omitted).

Accordingly, the Court must parse the summary judgment record[13] to determine the point when officers did complete or reasonably should have completed the business of the traffic stop,[14] and if any particular circumstance existed to provide officers with the reasonable suspicion (or even probable cause) to continue the detention beyond that point. The key question is whether the *dog sniff* occurred within the reasonable time

---

[13] While a defendant seeking suppression of evidence allegedly obtained in violation of the Fourth Amendment bears the burden of proof on the ultimate question of suppression, *see, e.g.*, *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) ("It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." (quotation omitted)), "[t]he Government has the burden of proof to justify a warrantless search." *United States v. Haynes*, 301 F.3d 669, 677 (6th Cir. 2002). The issue of whether officers impermissibly extended Belle's traffic stop prior to obtaining probable cause for the subsequent search of the vehicle aligns with those cases where the Government must justify its warrantless search—here, the initial stop and subsequent search were warrantless and the Government must demonstrate that any non-stop-related activities temporally fell within the ordinary timeline incident to the stop. *See United States v. Hicks*, No. 1:15-CR-126, 2016 WL 3090699, at *3 (S.D. Ohio June 2, 2016) (assigning burden of proof to government in post-*Rodriguez* traffic stop duration case).
[14] Belle concedes, at this time, that officers had probable cause to initiate the traffic stop. DE #18, at 6.

12

allotted for the traffic stop, not whether the entirety of the detention exceeded such reasonable time period. As Belle appears to acknowledge when arguing that law enforcement lacked reasonable suspicion to extend the stop by *requesting* a narcotics canine, *see* DE #18, at 6-9, the dog's positive alert prompted by the sniff established probable cause for the subsequent search and continued detention. *See United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994) ("In this case, the dog sniff is determinative of the issue of probable cause to search Diaz's car; before the dog alerted on the car, probable cause for a search did not exist. A positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance."). Here, Officer Karsner's affidavit sufficiently documents Lux's extensive training and certification for detecting the presence of marijuana, cocaine, heroin, methamphetamine, and ecstasy. DE #19-5, at 2. Claimant does not dispute these qualifications. This undisputed evidence of Lux's training supports a finding of probable cause for the search, post-alert. *See Florida v. Harris*, 133 S. Ct. 1050, 1058 (2013) ("Because training records established Aldo's reliability in detecting drugs and Harris failed to undermine that showing, we agree with the trial court that Wheetley had probable cause to search Harris's truck."). Additionally, a finding of probable cause satisfies *Rodriguez*'s requirement that *at least* reasonable suspicion support any added time. The Court therefore cabins its timeline analysis to the period prior to the sniff.[15]

With no proof from Belle, the evidence field is the officers' testimony and the police call log. As documented in the dispatch log, Officers Nichols and Merker radioed the stop of Belle into dispatch at approximately 5:00 p.m. DE #18-1 at 16. The officers

---

[15] The United States does not argue in its response that it had reasonable suspicion to prolong the stop at any earlier point.

requested a canine unit at approximately 5:01 p.m., and the requested units arrived at the scene of the stop at approximately 5:12 p.m. *Id.* Upon arrival, Officer Nichols described the reason for the canine request to Officer Karsner, who then decided to run Lux around the vehicle. DE #18-2, at 25. The exact timing of this conversation is unknown. The actual presentation of Lux to the vehicle took approximately 1 minute prior to the alert. *Id.* at 29. While the dispatch log does not (and would not) provide precise times for the officers' conversations and presentation of the dog, it does indicate that Sergeant Jared, whom Officer Nichols called to the scene *after* Lux's alert, the search, and the cash discovery, arrived on the scene at approximately 5:20 p.m. *Id.* at 34; DE #18-1, at 17. The record documents that a maximum of 17 minutes (from violation time indicated on the citation) elapsed between the stop and the canine unit's arrival. Using Sergeant Jared's 5:20 p.m. arrival as a marker, the stop-to-sniff period was no less than 17 and no more than 25 minutes long. The Court must now evaluate if the involvement of Lux impermissibly extended the traffic stop beyond its initial purpose.

Nichols's deposition testimony provides an estimated timeline for his typical traffic stop. DE #18-2 (Nichols Deposition), at 21-24. After engaging with a stopped driver, Nichols will radio dispatch to verify the driver's information and check for outstanding warrants. *Id.* at 21. Depending on how busy the radio is on a particular day, this check can take anywhere from a low of 3-5 minutes to a high of 20-25 minutes. *Id.* at 22-23. After receiving the requested information, Nichols will handwrite the applicable citation, a process that takes approximately 10-15 minutes. *Id.* at 24. According to Nichols's testimony, after initial contact, a normal traffic stop can last anywhere from 13-20 minutes on a quiet day to 30-40 minutes on a busy day.

Claimant argues that the stop should have ended within 10-15 minutes, the average time it takes Nichols to handwrite a citation. DE #18, at 5. The Government argues that the dog alert occurred within 18 minutes (plus the time of the short conversation between Nichols and Karsner) of the stop—well within the average time for a traffic stop described by Nichols. DE #20, at 4. There may be limits to the use of averages here: "The proper inquiry is not whether [subject] was detained longer than the average speeder, but whether he was detained longer than reasonably necessary for the Officers to complete the purpose of the stop in this case. . . . Therefore, we do not focus on the length of this stop as compared to the average traffic stop, but rather on 'whether [the Officers] improperly extended the duration of the stop to enable the dog sniff to occur' in the particular circumstances of this case." *United States v. Bell*, 555 F.3d 535, 541 (6th Cir. 2009) (quoting *Caballes*, 125 S. Ct. at 837). That said, Nichols's detailed testimony about his practices is a different variety of proof from generalized police averages. Thus, Nichols *always* writes citations by hand, and he testified to his own experience with respect to the time required for that act and for warrant checks and other stop-based queries. Nichols did not remember with precision the exact chronology here, but his habit-type and experiential proof is competent as a foundation for temporal analysis of this stop.

The Court also notes several elements that influence the stop timeline. Belle did not react to the stop in a typical fashion, which introduced some delay. He was not evading, but his choice to pull into the station and attempt to pump gas caused Nichols to respond differently than he otherwise would have. Nichols had to immediately exit and address Belle, leaving Merker to handle the radio. Because Belle initially exited, Nichols

felt the need to promptly exit a second time to make personal contact with Belle in case he decided to flee. Then, Belle searched for but was unable to provide most (or any) of the typical documentation sought (license, registration, insurance). This also would have elongated the subject matter of the stop, which went from a mere assessment of window tint to a driver operating without a license and without insurance. These circumstantial oddities consumed the first five minutes of the stop, prior to Nichols returning to the cruiser and screening Belle's information. Nichols quite reasonably, and as a traffic stop incident, took extra identification measures (such as the jail query) when encountering an unlicensed operator in a car not registered to the driver and with no evident insurance. Belle's tell-tale physical signs did not extend the stop but did cause Nichols reasonably to institute the parallel track of canine unit involvement. That began almost immediately (within 1 minute of the initial call dispatch) and added no length to the stop.

Because the original mission timeline for the stop certainly and reasonably encompassed the duration of the canine unit call, appearance, and sniff, no improper stop elongation occurred under *Rodriguez*. Indeed, in the Court's view, the time "reasonably required to complete the mission" really began when Nichols returned to the cruiser with Belle's identifying information and an appreciation for what the charges might be. That happened just after the 17:00:58 first call. Even if Nichols had immediately and in the most expeditious fashion screened Belle's information and written the ticket, between 13 and 20 minutes would then have elapsed until ticket completion, with much of that time out of Nichols's control. Within that same window, the canine units appeared, did the sniff, and indeed did the search. Thus, the sniff did not measurably extend the duration of the stop.

Nichols's testimony indicates that officers were diligently pursuing the traffic stop. Between 4:55 p.m. and 5:01 p.m., Nichols and Merker stopped Belle, waited for him to come to a complete stop, questioned him regarding the observed violation, and obtained his identifying information. Upon returning to the patrol vehicle, Nichols contacted dispatch to verify the information and check for outstanding warrants. DE #18-2, at 22. Obviously, the warrant check and verifications waited for the initial information. The ticket waited for the ascertainment of all violations, which here included the licensure and insurance subject matter. The canine unit involvement occurred within the time parameters of the original stop subject matter. *See Bell*, 555 F.3d at 542 (holding that additional investigative inquiries—such as requesting a canine unit—are permissible so long as officers are simultaneously pursuing the ends of the traffic stop).

Claimant rests his argument that the stop was impermissibly extended on the following characterizations: (1) that Nichols called for a canine unit *instead* of diligently writing the citation and (2) that Nichols received the results of the warrant check prior to the dog's arrival. DE #18, at 5-6. However, the summary judgment record does not support these contentions. As discussed above, officers requested the canine unit *in addition to and contemporaneously with* requesting information that the *Rodriguez* Court defined as "ordinary inquiries incident to" a traffic stop. 135 S. Ct. at 1615. Further, nothing in the record suggests that the officers received the results of the identity check from dispatch prior to the canine unit arriving. Even if they did, the normal stop-query-ticket chronology fully subsumed the time of Lux's role. When combined with the information regarding typical traffic stop protocols provided by Nichols, the Court finds, on this record, that officers did not impermissibly extend the stop. *See, e.g.*, *United States*

*v. Collazo*, 818 F.3d 247, 257-58 (6th Cir. 2016) (holding that stop of 21 minutes not unreasonable when officers were waiting for license check to come back, explaining citation, and obtaining a signature during that interval).[16]

> 2. *Material facts regarding the source of the seized currency genuinely remain in dispute; neither party is entitled to summary judgment under the applicable standard.*

While Plaintiff presents plentiful circumstantial evidence supporting the forfeiture of the seized currency as drug proceeds, summary judgment is inappropriate. Genuine disputes persist over the origin of the subject cash.

The Government argues that "all of the circumstances surrounding this seizure . . . when viewed together, indicate that no material facts remain in dispute that would prevent a judgment of forfeiture against the subject currency." DE #19, at 17. While Plaintiff acknowledges that its case is based primarily on circumstantial evidence, circumstantial evidence alone can be sufficient to establish forfeitability. *See United States v. $118,170.00 in U.S. Currency*, 69 F. App'x 714, 717-718 (6th Cir. 2003). Here, Plaintiff argues that the totality of the circumstances, namely, the drug dog alert to the

---

[16] Neither side discusses in any detail whether the exclusionary rule would apply, even if *Rodriguez*'s limits were implicated. The Court does not make a finding in that regard but simply notes that the exclusionary rule targets misconduct. *See United States v. Godfrey*, 427 F. App'x 409, 412-13 (6th Cir. 2011); *United States v. Master*, 614 F.3d 236, 241-43 (6th Cir. 2010). There is no suggestion of misconduct by Nichols (or any other officer) in this record, and if the Court did determine that the stop chronology indicated a *Rodriguez* issue, the Court also would carefully assess whether and to what extent any remedy would attend a violation. Relevant, in the Court's view, would be not just the issue of the culpability level, if any, of any officers, but also the issue of how, when, and under what circumstances Belle took the car from the scene. (If Belle was free to go but the car couldn't be moved by him, the car staying in place for a longer period would impact the delay calculus). Again, with the rule targeting deterrence and misconduct, the Court would assess the full range of the situation in evaluating the effect of any constitutional violation on the evidence in this case. Because, on this record, the Court finds no violation, it does not pursue the secondary analysis.

subject currency, the "marijuana shake" found in the vehicle during the search, the amount and bill denomination of the seized currency, Claimant's criminal history, Claimant's lack of sufficient (and verifiable) legitimate income, and inconsistent proof regarding the source of the seized cash, support forfeiture. If undisputed (or accepted by a trier of fact), these facts would cross the CAFRA preponderance threshold. *See United States v. $21,055.00 in U.S. Currency*, 778 F. Supp. 2d 1099 (D. Kan. 2011) (holding that combined facts that claimant had no legitimate income (from tax returns) to substantiate amount of currency found, method of currency bundling, positive dog alert, and large quantity of cash, established by preponderance that cash was forfeitable); *United States v. $50,720.00 in U.S. Currency*, 589 F. Supp. 2d 582 (E.D.N.C. 2008) (holding currency forfeitable on summary judgment on similar assertions plus the fact that currency was found in the false bottom of a suitcase).

However, on this record, the ultimate origin of the seized currency, and therefore its forfeitability as a matter of law on summary judgment, remains in dispute. In his deposition testimony, Claimant states that the $38,005.00 originated from his joint cash savings with his girlfriend of 16 years, Renee Duff. DE #18-3, at 4-7. The couple stored funds in a household safe. *Id.* According to Belle, the couple preferred to have significant amounts of cash on hand to finance vacations and his gambling activities. *Id.* Ms. Duff confirmed this origin story, further stating that seized cash represented a portion of "over eight, ten years that [they] were saving together, our cash together." DE #19-7 (Renee Duff Dep.), at 9. She described the savings as "money we saved together freely that we kept separate from everything else." *Id.* Additionally, Belle has consistently stated he intended to use the seized cash to purchase real estate on the date of the seizure. DE #4

(Verified Claim), ¶ 5; DE #18-3 (Belle Dep), at 9-11 ("Q: When you say you were trying to get into the rental property thing, what were you planning on doing with this money that was seized? A: Buying a duplex on Mulberry Street in Lebanon, Kentucky. A guy by the name of Uncle Moe, an older guy's trying to get rid of them. . . . But he wanted 40 – 40-something – like 40-some thousand and I was willing to show him if I, you know, had the cash so I could get it cheaper, you know.").

The Government attacks the origin story by pointing to several inconsistencies scattered through the summary judgment record. In his verified claim, Belle stated that $29,400.00 of the seized currency was withdrawn by Duff from a standing line of credit for the purpose of making a cash offer on real estate; the remaining funds were additional cash on hand from payments made by tenants on his rental properties. DE #4 (Verified Claim), ¶¶ 5-7. However, in deposition testimony, Duff stated that a majority of this $29,400 was withdrawn on the credit line and paid over for the construction of a pool at Belle and Duff's new residence. *See* DE #19-7 (Renee Duff Dep.), at 21-22. Similarly, the deposition testimony of Belle, Duff, and Michael Duff, Renee's father, clearly demonstrates that Belle neither owns rental property from which he collects income nor receives any direct payment from Michael Duff for collecting rents from properties owned by Mr. Duff. *See* DE ##18-3 (Belle Dep.), at 9; 19-7 (Renee Duff Dep.), at 13-14, 25-26; 19-8 (Michael Duff Dep.), at 9-10, 13-14. Further, the Government points to Belle's admittedly low documented income and failure to file tax returns for the past several years to portray any legitimate source for the currency as unlikely.

These inconsistencies in Belle's statements and his lack of legitimate income sharply bring into question the credibility of his testimony. However, nothing presented

by the United States specifically contradicts the claim, supported by statements from both Belle and Renee Duff, that the cash was the result of several years of joint savings. *See United States v. $61,200.00 in U.S. Currency, more or less*, 805 F. Supp. 2d 682, 692 (S.D. Iowa 2010) ("The government has not conclusively disproved the defendant currency did not come from claimant's life savings or the income reported for 2006 and 2008. The Court finds there is a genuine issue of material fact on the origin of the defendant currency."). Certainly, there is a lot not to like about Belle's story. He does paint a confusing (and in some ways contradictory) picture of the exact safe contribution history, withdrawal history, and contents over time. Despite that, however, the Court must carefully avoid crossing the line into credibility determinations in the context of summary judgment. Indeed, the Court must draw inferences against the relative movant and consider evidence in the light most favorable to the non-movant. The Court notes the following factors:

a. Belle and Duff contributed differently, but Belle obviously had the right to access the full safe contents as he saw fit. *See, e.g.*, DE #18-3 (Belle Dep.), at 18; DE #19-7 (Renee Duff Dep.), at 10, 26, 35-37. Thus, Belle describing himself as the complete owner squares, as an inference, with his essentially unilateral control of the safe and its contents.

b. Belle regularly described Duff as the primary contributor to the safe. His share description varied, but Duff, who evidently has a significant income, certainly could plausibly fund the amounts attributable to her in the safe. This trends against deeming the seized amount as inarguably drug proceeds. Further, because Belle ultimately testified to a low direct stake in creating the fund, his lower

21

verifiable income weakens the inference that all cash came from an illicit source. The couple was surely lax in tracking and accounting for the safe's store, but sloppy accounting does not create an ironclad inference of crime.

c.  Belle did report regular and ongoing income, during the relevant period, from multiple sources. This included commission work, work as a jobber or middleman, a partnership for construction (e.g., roofing), repossession work, and gambling winnings to include significant cashed tickets or successful wagers at Keeneland, the Red Mile, and at various sporting events. *See, e.g.*, DE #18-3 (Belle Dep.), at 20 (describing regular monthly income of $1,500 per month in first half of 2014); *id.* at 25, 41 (describing $9,000 Keeneland winnings in 2013); *id.* at 35 (describing roofing income, including $8,000); *id.* at 15 (describing substantial sports bet winnings); *id.* at 38 (describing taxable earnings of $6,000 to $7,000 in 2013). He readily admitted paying no taxes. That hurts his credibility, but a person can, as a factual matter, both earn income and unlawfully choose not to file returns as to and not pay taxes on that income. Here, under oath, Belle described a regular (if hard to verify) income stream. Both Duff and her father did corroborate significant aspects of Belle's earnings descriptions. *See* DE #19-7, at 10-14, 25-27, 38; DE #19-8, at 8-9, 11-12, 17-20.

d.  Both Belle and Duff described the savings as accumulating over a lengthy period. *See* DE #18-3 (Belle Dep.), at 4-5; DE #19-7 (Renee Duff Dep.), at 9. Further, Belle described large chunks derived from property sales and individual gambling winnings. Duff also described particular contributions over time.

e. Belle does affirmatively deny under oath that the funds originated from any

"illegal purchase." DE #4 ¶ 10. He describes a planned real estate deal and the

nexus of the cash to that deal. Duff, while not directly in the loop on that day,

does confirm that the duplex purchase was on the table and that the safe held an

amount of legitimate cash that could have funded the plan.

Any lingering credibility concerns regarding Belle and Ms. Duff's testimony—and the

Court recognizes that they certainly exist—must be presented to a jury. *See Thomas v.*

*Arnold*, 696 F. Supp. 2d 882, 887 (N.D. Ohio 2010) ("This case is not suited for summary

judgment because it is not this Court's role to weigh the credibility of Arnold's statement.

The trier of fact must decide her credibility, and that of Plaintiff's, at trial.").

This is not to say that the Government lacks compelling evidence in support of

forfeiture. A properly-trained narcotics canine alerted twice to the seized cash, which is

admittedly indicative of a probable link between the cash and drugs.[17] *See $21,055.00*,

778 F. Supp. 2d at 1105. Belle has limited documented income in the years preceding the

seizure. The large dollar value of the cash, its method of storage and bundling, and the

particular assortment of bill denominations raise significant suspicion when viewed in

light of the positive dog alert. *See United States v. $5,000.00 in U.S. Currency*, 40 F.3d

846, 850 (6th Cir. 1994) (recognizing that "carrying a large sum of cash is strong

evidence of some relationship with illegal drugs" when supported by other indicia of

---

[17] The Court doubts the ultimate probative strength of the "marijuana shake." Officers
observed the "shake"—and likely have experiential knowledge to support identifying the
residue as such—but did not test it or retrieve a sample. Further, on its own, the presence
of "shake" is, per Officer Karsner, evidence of drug use, not trafficking.

illegal activity). Perhaps the biggest problem for Belle[18] is the wild variety of stories he told about how the cash came to be. The jury may well hear and reject each and every version, settling instead on a more nefarious inference. Only the jury can knife through the layers of proof and choose the one to believe. As the Sixth Circuit counsels:

> We emphasize, however, that in reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited. When the non-moving party presents direct evidence refuting the moving party's motion for summary judgment, the court must accept that evidence as true. This is the case even when the nonmovant's account is contradictory.

*Schreiber v. Moe*, 596 F.3d 323, 333-34 (6th Cir. 2010) (quotations and citations omitted). Here, the Government repeatedly argues credibility and that "Claimant's explanations here are . . . entitled to little weight." DE #20, at 5. That may be so, but the jury must be the one to so decide and say.

Ultimately, a jury could justifiably find that the above mentioned facts, in light of whatever credibility concerns regarding Belle's testimony may arise at trial regarding the cash's origins, show by a preponderance of the evidence that the currency is subject to forfeiture under CAFRA. *See United States v. Veggacado*, 37 F. App'x 189, 191 (upholding jury verdict and stating: "A reasonable jury could thus infer form this evidence that the only income Veggacado had with which to purchase the items [subject to forfeiture] came from trafficking drugs."). However, given the cash's disputed origins and the Government's inability to dismiss Belle and Renee Duff's sworn testimony regarding same under Rule 56, the current record does not entitle the United States to judgment as a matter law. *Veggacado* is a telling parallel. There, the court assessed

---

[18] The Court questions the admissibility of Belle's record as substantive proof that the cash here is trafficking proceeds. Also, to the extent the United States relies on Renee Duff's statements to SA Hart, those probably are hearsay. She, unlike Belle, is not a party. Whether and how the Government can use prior statements of Duff to Hart is a matter for consideration in the context of trial.

sufficiency of proof as to a jury verdict. Here, the Government seeks summary judgment, but as with *Veggacado*, the jury must encounter and parse the trial proof for itself.

**IV.    Conclusion**

For the reasons stated herein, the Court **DENIES** the cross-motions for summary judgment (DE ##18, 19).

This the 22d day of June, 2016.

Signed By:

*Robert E. Wier*

United States Magistrate Judge